**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Robert Joseph Benge,

              Plaintiff,

v.

Charles L. Ryan, et al.,

              Defendants.

No.  CV 14-00402-PHX-DGC (BSB)

**ORDER**

      Plaintiff Robert Joseph Benge, who is currently confined in the Arizona State Prison Complex-Lewis (ASPC-Lewis), brought this civil rights case pursuant to 42 U.S.C. § 1983.  Doc. 1.  Pending before the Court are the following motions: (1) Defendants Casey Tucker, Christina Mahler, and Corizon, LLC's motion for summary judgment (Doc. 64), which Plaintiff opposes (Doc. 93); (2) Defendant Wexford Health Sources, Inc.'s motion for summary judgment (Doc. 88), which Plaintiff opposes (Doc. 113); (3) Defendant Kenneth Merchant's motion for summary judgment (Doc. 96), which Plaintiff opposes (Doc. 111); (4) Defendants Charles Ryan, Richard Pratt, and Josh Santo's motion for summary judgment (Doc. 119), which Plaintiff opposes (Doc. 126); (5) Plaintiff's motion to supplement his response to Defendants Tucker, Mahler, and Corizon's motion for summary judgment (Doc. 124); and (6) Plaintiff's motion to reopen discovery and file an amended complaint (Doc. 146).[1]

---

[1] Pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), the

The Court will deny Plaintiff's motion to supplement and will summarily deny Plaintiff's motion to re-open discovery and amend his complaint.[2]  For the reasons that follow, the Court will grant summary judgment to Defendants Ryan, Pratt, Mahler, Wexford, and Corizon, and deny summary judgment to Defendants Santo, Merchant, and Tucker.

## I.    Background.

In his Complaint, Plaintiff asserted two Counts of the denial of constitutionally adequate medical care.  Doc. 1.  Plaintiff seeks damages.[3]

In Count I, Plaintiff alleged that his Eighth Amendment rights were violated when he was denied immediate treatment for a fractured left tibia that he injured on May 3,

---

Court provided notice to Plaintiff regarding the requirements of a response to each motion for summary judgment.  Docs. 66, 90, 98, 121.

[2] Plaintiff filed his Motion to amend his complaint and reopen discovery on December 17, 2015.  The deadline for amending pleadings was December 28, 2014.  Doc. 27 at 1.  Thus, his request to amend his complaint a year later is untimely.  Moreover, Plaintiff's request to amend does not comply with Local Rule of Civil Procedure 15.1, which requires a plaintiff seeking to amend a complaint to submit a "proposed amended pleading as an exhibit to the motion."  LRCiv 15.1(a).  Plaintiff did not attach a proposed amended pleading to his Motion.  As to Plaintiff's request to reopen discovery, the Court's scheduling order required depositions to take place by January 27, 2015 and written discovery requests to be served by February 26, 2015.  Doc. 27 at 1-2.  Plaintiff now seeks to reopen discovery to obtain hospital records, conduct depositions, and submit interrogatories and requests for documents.  Doc. 146 at 4.  Plaintiff states that he had spinal surgery on November 17, 2015 and he apparently seeks records from that surgery.  But Plaintiff provides no information as to what specific documents he seeks, why he cannot subpoena his hospital records, who he seeks to depose, or what interrogatories he needs to propound.  Therefore, Plaintiff has not shown good cause why discovery should be reopened at this late juncture.  *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (Rule 16(b)(4) permits a scheduling order to be modified only upon a showing of good cause by the party seeking amendment); *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1026 (9th Cir. 2006).  For the foregoing reasons, Plaintiff's request to amend his complaint and reopen discovery will be denied.

[3] Plaintiff filed separate motions for injunctive relief (Docs. 12, 16), which the Court denied on February 23, 2015.  Doc. 56.  Plaintiff did not renew his request for injunctive relief.

2012.   Plaintiff was taken that day to the ASPC-Lewis emergency room and was evaluated by Nurse Mahler.  Plaintiff was told he had a sprain, not a bone injury.  Dr. Merchant told Mahler to give Plaintiff ice and that he would order x-rays, but Plaintiff's left leg and knee, which were swollen, were not "immobilized or stabilized" that day or any time thereafter.  *Id.* at 5.[4]

On May 13, 2012, Plaintiff submitted a Health Needs Request ("HNR") about his leg (*id.*), and saw Mahler and Nurse John Doe on May 14, 2012 (*id.* at 8).  Plaintiff alleged that Mahler and Doe saw that he "could hardly walk on his own," but nevertheless failed to splint, immobilize, or stabilize his "badly swollen, bruised left knee and leg."  *Id.*  Plaintiff alleged that Mahler and Doe "actively thwarted" his attempt to see a doctor.  *Id.* at 9.

On June 12, 2012, Dr. Merchant evaluated Plaintiff and saw "how swollen and bruised Plaintiff's knee and leg" were.  *Id.*  Plaintiff asked why x-rays were never taken, and Merchant told Plaintiff that it was too late to take x-rays given the date of Plaintiff's injury and that, instead, Plaintiff needed an MRI.  *Id.*

Plaintiff had an MRI on July 3, 2012, and it showed "an incomplete transverse fracture through the medial tibial metaphysis," but no one told Plaintiff about the fractured tibia until November 15, 2012, when he saw Dr. John Vanderhoof, M.D., an orthopedic surgeon.  *Id.* at 9-10.   Plaintiff claims that because he did not receive immediate treatment, he has suffered permanent injury and continuing pain.  Plaintiff alleged that Arizona Department of Corrections (ADC) Director Charles Ryan, ADC Director of Health Services Richard Pratt, and Wexford, the private healthcare provider under contract with ADC beginning July 1, 2012, "neglected the serious medical needs of inmates by failing to manage, support, supervise and administer medical care to prisoners."  *Id.* at 7.

In Count II, Plaintiff alleged that his Eighth Amendment rights were violated

---

[4] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

when, on several occasions in 2013 and 2014, he did not receive his prescribed pain medications.  Corizon had replaced Wexler as the provider of inmate healthcare during this time period.  Plaintiff alleged that on June 18, 2013, his prescription medications Gabapentin and Propranolol were abruptly discontinued for three months.  Plaintiff alleged that on September 18, 2013, physician's assistant Carey Tucker abruptly discontinued his Baclofen prescription and reduced his Gabapentin from 3,200 mg daily to 600 mg daily, even though both were prescribed for "neurovascular compromise [and] muscle spasms for the fracture[d] tibia that was never treated."  *Id.* at 18.  Plaintiff's Tramadol prescription, which he took to manage the pain related to an eye condition, was stopped on November 5, 2013, and his Gabapentin 600 mg daily was stopped "cold turkey" on January 16, 2014 and has not been renewed.  *Id.*  On January 14, 2014, Plaintiff saw an outside eye specialist, Dr. Warren Heller, M.D., who wrote a prescription for Tramadol 300 mg twice daily for pain management, but Tucker refused to prescribe this medication for Plaintiff.  Plaintiff alleged that Tucker is only prescribing psychotropic medications to inmates for pain management, "pursuant to a policy implemented" by Corizon, Ryan, Pratt, and ADC.  *Id.* at 19.

On screening under 28 U.S.C. § 1915A(a), the Court ordered Defendants Ryan, Pratt, Wexford, Merchant, and Mahler to answer the allegations in Count I and Defendants Ryan, Pratt, Corizon, and Tucker to answer the allegations in Count II.  Doc. 6.  The Court dismissed the remaining Defendants without prejudice.  The Court also found that Plaintiff had stated a claim against Defendant Nurse Doe, but did not order service on the unidentified Defendant.  In a subsequent Order, the Court ordered that Josh Santo be substituted for Defendant Nurse Doe in Count I of the Complaint, and that Santo answer Count I.  Doc. 51.

## II.    Plaintiff's Motion to Supplement.

Defendants Tucker, Mahler, and Corizon ("Corizon Defendants") filed their motion for summary judgment on March 12, 2015, Plaintiff filed a response on May 18, 2015, and the Corizon Defendants filed a reply on June 1, 2015.  On August 17, 2015,

Plaintiff filed a motion to supplement his response to the Corizon Defendants' motion for summary judgment.  Doc. 124.  Defendants have not responded to Plaintiff's motion, and the time to do so has passed.

Plaintiff seeks to add a July 2015 article entitled "The Making of Made in his Image: A Camera Made from Living Tissue!," by Randy J. Guliuzza, P.E., M.D., in a publication called *Acts & Facts*.  *Id.* at 12-14.  The two-page article compares the lens of a sophisticated camera to the eye and discusses the components of an eye, stating in one part that "[c]orneas are likely the most pain-sensitive tissues in the body, with sensory innervation over 400 times greater than that of most skin and even dozens of times more sensitive than our teeth or fingertips."  *Id.* at 14.  Plaintiff contends that the article is relevant to his claim that medication was necessary for management of his eye pain.  *Id.* at 2-4.  The article, though, does not appear to be about diseases of the eye, eye pain, or treatment thereof.

Printed material "purporting to be a newspaper or periodical" is self-authenticating.  Fed. R. Evid. 902(6).  This article is therefore self-authenticating.  Its content, however, is hearsay not subject to any exception and it does not appear to be relevant to Plaintiff's particular eye condition.  Accordingly, the article is not admissible for summary judgment purposes.  Because the article is not admissible for summary judgment, the Court will deny Plaintiff's motion to supplement.

**III.   Legal Standards.**

**A.   Summary Judgment.**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

1    If the movant fails to carry its initial burden of production, the nonmovant need
2    not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d
3    1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the
4    burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that
5    the fact in contention is material, i.e., a fact that might affect the outcome of the suit
6    under the governing law, and that the dispute is genuine, i.e., the evidence is such that a
7    reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*,
8    *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d
9    1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact
10   conclusively in its favor, *First National Bank of Arizona v. Cities Service Co.*, 391 U.S.
11   253, 288-89 (1968); however, it must "come forward with specific facts showing that
12   there is a *genuine issue for trial*," *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio*
13   *Corp.*, 475 U.S. 574, 587 (1986) (quotation and citation omitted) (emphasis in original);
14   *see* Fed. R. Civ. P. 56(c)(1).

15   At summary judgment, the judge's function is not to weigh the evidence and
16   determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,
17   477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and
18   draw all inferences in the nonmovant's favor.  *Id.* at 255 (citation omitted).  "The court
19   need consider only the cited materials, but it may consider other materials in the record."
20   Fed. R. Civ. P. 56(c)(3).

21   **B.    Eighth Amendment Medical Care.**

22   To succeed on a medical-care claim under the Eighth Amendment, a prisoner must
23   demonstrate "'deliberate indifference to serious medical needs.'"  *Jett v. Penner*, 439
24   F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).
25   There are two prongs to the deliberate-indifference analysis: an objective standard and a
26   subjective standard.  First, a prisoner must show a "serious medical need."  *Id.* (citations
27   omitted).  "A 'serious' medical need exists if the failure to treat a prisoner's condition
28   could result in further significant injury or the unnecessary and wanton infliction of

1   pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other*
2   *grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc)
3   (quotation marks and citation omitted).  Examples of indications that a prisoner has a
4   serious medical need include "[t]he existence of an injury that a reasonable doctor or
5   patient would find important and worthy of comment or treatment; the presence of a
6   medical condition that significantly affects an individual's daily activities; or the
7   existence of chronic and substantial pain." *Id.* at 1059-60.

8          Second, a prisoner must show that "the defendant's response to that need was
9   deliberately indifferent."  *Jett*, 439 F.3d at 1096.  The state of mind required for
10  deliberate indifference is subjective recklessness; however, the standard is "less stringent
11  in cases involving a prisoner's medical needs . . . because '[t]he State's responsibility to
12  provide inmates with medical care ordinarily does not conflict with competing
13  administrative concerns.'"  *McGuckin*, 974 F.2d at 1060 (quoting *Hudson v. McMillian*,
14  503 U.S. 1, 6 (1992)).  Whether a defendant had requisite knowledge of a substantial risk
15  of harm is a question of fact, and a fact finder may conclude that a defendant knew of a
16  substantial risk based on the fact that the risk was obvious.  *Farmer v. Brennan*, 511 U.S.
17  825, 842 (1994).

18         "Prison officials are deliberately indifferent to a prisoner's serious medical needs
19  when they deny, delay, or intentionally interfere with medical treatment."  *Hallett v.*
20  *Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (quotation marks and citations omitted).
21  Deliberate indifference may also be shown by the way in which prison officials provide
22  medical care, *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988), or "by
23  circumstantial evidence when the facts are sufficient to demonstrate that a defendant
24  actually knew of a risk of harm," *Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir.
25  2003) (citations omitted).  And deliberate indifference may be shown by a purposeful act
26  or failure to respond to a prisoner's pain or possible medical need.  *Jett*, 439 F.3d at 1096.
27  But the deliberate indifference doctrine is limited; an inadvertent failure to provide
28  adequate medical care or negligence in diagnosing or treating a medical condition does

not support an Eighth Amendment claim. *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted). Further, a mere difference in medical opinion does not establish deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

Finally, even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096 (citations omitted); *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (finding that delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

**IV.    Defendants Ryan, Pratt, and Santo's Motion for Summary Judgment.[5]**

      **A.    Relevant Facts.**

          **1.    Plaintiff's Leg Injury.**

Plaintiff fell on May 3, 2012 and injured his left leg. Doc. 1 at 5. Plaintiff alleges that he was seen by Mahler in the ASPC-Lewis emergency room for his leg injury that same day, and that he was told he had a sprain and was given medical ice.[6] *Id.* The ADC Defendants contend that Plaintiff did not complain about his leg injury until he submitted his May 13, 2012 HNR, in which Plaintiff wrote that he "hurt [his] leg running a week ago, and [he] can still hardly walk on it. It is getting worse with pressure, swelling." Docs. 120 at 5, ¶ 19; 120-3 at 8. Plaintiff wrote that his pain was a 7-8 on a scale of 1-10 and that he wanted to see the healthcare provider "as x-rays may be needed." Doc. 120-3 at 8. Plaintiff disputes Defendants' assertion as to when he first complained about his injury, averring that he complained about his injury to "security staff/medical staff" on May 3, the day of the injury, and that he submitted an HNR on May 8, 2012. Docs. 127 at 3; 127-1 at 10. Defendants dispute that Plaintiff ever submitted an HNR dated May 8, 2012, and assert that Plaintiff's medical file does not contain an HNR with that date. Docs. 141 at 5; 142 at 1, ¶ 1; 142-1 at 2, ¶ 2. Plaintiff submits a May 8, 2012 HNR which

---

[5] The Court will refer to these Defendants collectively as the "ADC Defendants."

[6] No party has produced a medical record for May 3, 2012.

states: "I hurt my leg a few days ago, ER only gave me ice.  Something 'real bad' is wrong with my leg.  Request x-ray be performed.  It's hard to walk because every step hurts."  Doc. 127-1 at 10.  There is nothing written in the portion of the HNR reserved for medical personnel.

Plaintiff saw Santo, a registered nurse, on May 14, 2012, for his complaints of pain in his left leg.  Doc. 120 at 5-6, ¶ 20.  According to Santo, Plaintiff's left leg showed no evidence of trauma, swelling or bruising, and Plaintiff was able to bear weight on his left leg.  *Id.*; Doc. 120-3 at 39-40, ¶ 10.  Santo determined that Plaintiff was experiencing "alteration in comfort" and recommended that Plaintiff monitor his leg and if the pain did not subside in a few days, he should submit an HNR to medical.  *Id.*  Santo issued Plaintiff a special needs order ("SNO") for medical ice for three days.  *Id.*  Plaintiff disputes Santo's observation that there was no evidence of trauma, swelling or bruising or that he could bear weight on his leg.  Docs. 127 at 3; 127-1 at 10.  Plaintiff points to his May 13 HNR which states that his leg was "getting worse with pressure, swelling."  Docs. 127 at 3; 127-1 at 11.

On May 22, 2012, Plaintiff submitted another HNR, stating that he saw the nurse the week before due to an injury to his left leg and that he is "in excruciating pain still."  Docs. 120 at 6, ¶ 22; 120-3 at 15.  Plaintiff asked "to see the provider A.S.A.P."  Doc. 120-3 at 15.  Santo saw Plaintiff on May 31, 2012 for his "complaint of left knee pain"; Santo examined Plaintiff's left leg and "did not observe any swelling or signs of trauma."  Doc. 120 at 6, ¶ 23.  Santo again assessed Plaintiff as "experiencing alteration in comfort," gave Plaintiff medical ice, and scheduled him to see the healthcare provider.[7]  *Id.*  Plaintiff disputes that Santo did not notice any trauma or swelling, noting that Santo nonetheless gave him medical ice.  Doc. 127 at 4.

On June 5, 2012, Santo noted in Plaintiff's medical chart that Plaintiff was at the medical unit requesting an x-ray of his left knee and a consult for his eyes.  Doc. 120 at 6,

---

[7] Santo also noted that Plaintiff wanted a consult to an eye doctor.  Doc. 120 at 6, ¶ 23.

¶ 24.  That same day, Plaintiff saw Merchant, a medical doctor, for his complaints of "continued pain in his left knee and issues related to his eye condition."  *Id.*, ¶ 25.  In Plaintiff's medical chart, Merchant noted left "knee pain" and "tender tibial plateau, unable to one leg stand, flex/ext."  Doc. 120-3 at 11.  Merchant ordered an MRI of Plaintiff's left knee and a consultation with an orthopedic specialist.  Doc. 120 at 6, ¶ 25.[8]  The MRI was performed on Plaintiff's left knee on July 3, 2012, and it showed an "incomplete transverse fracture through the medial tibial metaphysis with diffuse bone marrow edema."  Docs. 120 at 6, ¶ 26; 120-3 at 18.  On July 13, 2012, Merchant noted the results of the MRI in Plaintiff's chart and ordered an "ortho/surg consult" and to make an appointment for July 17, 2012 to discuss the MRI.  Doc. 120-3 at 11, 22.

On July 9, 2012, Plaintiff filed an HNR asking for an appointment with the provider to discuss the results of his MRI and to discuss safety glasses because of his cornea transplant.  Doc. 120 at 7, ¶ 27.  On August 7, 2012, Plaintiff saw Dr. Merchant "for his complaint of eye injuries"; Merchant noted in Plaintiff's medical chart that Plaintiff has keratoconus and had corneal transplants in both eyes.[9]  *Id.* at 7, ¶ 29; Doc. 120-3 at 24.  Plaintiff disputes that he was seen for "eye injuries"; he states that Nurse Reese told him this appointment was to discuss the MRI results.  Doc. 127 at 4.  The ADC Defendants aver that Merchant was not able to discuss the MRI results at the August 7th appointment "due to time constraints."  Doc. 120 at 7, ¶ 30.  Plaintiff disputes that time constraints alone prevented them from discussing the MRI results; he asserts that Dr. Merchant "refused to discuss the MRI results."  Doc. 127 at 4, ¶ 30.  On August

---

[8] As support for paragraph 25, the ADC Defendants cite, in part, to Plaintiff's medical chart where Merchant wrote "MRI L knee" and "ophth consult," which appears to refer to an ophthalmological consultation rather than an orthopedic consultation.  Doc. 120-3 at 11.

[9] "[K]eratoconus is a degenerative disorder of the eye in which structural changes within the cornea cause it to thin and give it a more conical shape rather than a more normal, gradual curve.  It may cause visual distortion and sensitivity to light."  Doc. 65 at 6-7, ¶ 21.

8, 2012, Plaintiff submitted an HNR asking for an appointment to discuss the MRI results because they were not able to do so during his August 7th appointment.  Docs. 120 at 7, ¶ 30; 120-3 at 27.

On November 15, 2012, Plaintiff was examined by Dr. John Vanderhoof of Tempe St. Luke's Hospital.  Doc. 120 at 7, ¶ 31.  Plaintiff testified at his deposition that it was during this visit with Vanderhoof that he learned for the first time that he had fractured his tibia when Vanderhoof asked him, "How in the hell did you fracture your tibia?"  Doc. 127-2 at 10 (Pl Dep. at 37:18-19).  According to the ADC Defendants, Vanderhoof noted that Plaintiff complained of "medial knee pain and medial tibial pain," but that Plaintiff denied any numbness, tingling, or other complaints.  Doc. 120 at 7, ¶ 31.  Plaintiff disputes that he denied any numbness or tingling.  Doc. 127 at 4, ¶ 31.  In his consultation report, Vanderhoof noted that four and a half months after his injury, Plaintiff's "left knee has a full range of motion.  He does have pain over the pes bursa.  He has no swelling.  He has no pain over the anterior aspect of the tibia, but medially over the pes bursa, he is significantly painful."  Doc. 120-3 at 29.  Vanderhoof wrote that Plaintiff injured his knee while running and noticed "onset of pain and swelling in his left knee" and "was not able to walk after a while."  *Id.*  Plaintiff "presented to the emergency room where he was evaluated and told he was okay.  He subsequently has had an MRI" that "shows a medial proximal tibial fracture."  *Id.*

Vanderhoof ordered x-rays during Plaintiff's visit, and they were taken that same day.  Doc. 120 at 7, ¶ 31.  Vanderhoof wrote that x-rays showed "a healed medial and proximal tibial fracture with some slight callus formation present.  Medially, that is probably near the pes bursa."  Doc. 120-3 at 29.  Vanderoof's impression was that Plaintiff suffered from "left pes bursitis, status post proximal medial tibial fracture."[10]  *Id.*  Vanderhoof gave Plaintiff an injection of Lidocaine, Marcaine, and Depo-Medrol into the

---

[10] "Pes bursitis is an inflammation of the bursa located between the tibia and three tendons of the hamstring muscle at the inside of the knee.  It occurs when the bursa becomes irritated and produces too much fluid, which causes it to swell and put pressure on the adjacent parts of the knee."  Doc. 65-1 at 6, ¶ 14.

left pes bursa, which provided "immediate pain relief of his symptoms." *Id.* at 30.

Plaintiff saw Dr. Vanderhoof for a follow-up visit on June 27, 2013.  Doc. 120 at 7, ¶ 33.  Vanderhoof's report noted the July 2012 MRI results showing a "medial tibial metaphyseal fracture."  Doc. 120-3 at 36.  Vanderhoof also wrote:

> He has been complaining of medial and proximal tibial pain consistent with pes bursitis.  He has a lot of issues with regards to board filings for malpractice and so forth.  We had long discussions with regards to this.  I think _____ treated properly since the beginning _____ quite normally and his bone is completely healed.  He did not know all the details, but certainly the end result is excellent.  His pes bursitis is likely not related to his fracture or any treatment thereof.  I think his pes bursitis is strictly due to his hamstring tightness.[11]

*Id.* (omissions in original).

Vanderhoof also noted that Plaintiff was complaining of left plantar fasciitis, which "is treatable with gentle stretching."  *Id.*  Vanderhoof gave Plaintiff an injection into his left pes bursa, which gave Plaintiff "immediate pain relief of his symptoms."  *Id.*

Plaintiff submitted an Inmate Letter on November 19, 2012, stating that "[i]n July [sic] I hurt my leg running and I submitted an HNR requesting an x-ray to no avail."  Docs. 120 at 9, ¶ 41; 120-4 at 62.  Plaintiff wrote that when he saw Dr. Vanderhoof on November 15, 2012, he "was told that [he] broke [his] left leg just under the knee and it healed back wrong."  Doc. 120-4 at 62.  Plaintiff asked "why the [department] is being deliberately indifferen[t] to [his] serious medical needs in not seeing [him] so x-rays could be taken."  *Id.*  Corrections Officer III Bruemmer responded to Plaintiff's Inmate Letter on November 20, 2012, advising Plaintiff that his medical issue "was forwarded to medical in care of P. Carlson."  Docs. 120 at 9, ¶ 42; 120-4 at 64.

On December 9, 2012, Plaintiff submitted an Inmate Grievance.  Doc. 120 at 9-10,

---

[11] Plaintiff believes Vanderhoof said he was properly treated and that the end result was excellent because Vanderhoof did not have "all the information" at this visit. Doc. 127 at 5, ¶ 33.  As support, Plaintiff generally cites to his deposition, but provides no page number that would support his assertions and he does not explain what information Vanderhoof was lacking.

¶ 43.  Plaintiff wrote that he did not receive a response to his November 19, 2012 Inmate Letter, and that he hurt his leg in July and requested x-rays because he "could barely walk."  Doc. 120-4 at 66.  Plaintiff said that Dr. Vanderhoof told him in November that he broke his leg; now he has "pain issues [and] swelling."  *Id.*  He asked to see an orthopedic surgeon and to discuss pain management and balance issues with the provider.  *Id.*  Plaintiff submitted an Inmate Grievance Appeal on January 5, 2013, stating that he did not receive a response to his Inmate Grievance, and asking to see the healthcare provider for pain management and for an orthopedic consultation with Dr. Vanderhoof.  Docs. 120 at 10, ¶ 44; 120-4 at 68.  Plaintiff asked why it took months before x-rays of his leg were taken and why it took four months to learn the results of his MRI and that his leg was broken.  *Id.*

On March 22, 2013, ADC Deputy Director Jeff Hood wrote a response to Plaintiff's Inmate Grievance Appeal on behalf of ADC Director Ryan.  Doc. 120 at 10, ¶ 45.  Hood wrote that Plaintiff's Grievance Appeal was partially upheld because his investigation "showed no evidence that medical staff responded to your grievance; for this reason, your appeal is partially upheld."  Doc. 120-4 at 70.  Hood then related the history of Plaintiff's medical visits regarding his leg, beginning with Santo's evaluations on May 14 and May 31, 2012 in which Santo saw "no sign of trauma, swelling or bruising" and "weight bearing was intact."  *Id.* (emphasis in original).  Hood wrote that Plaintiff saw a medical provider on June 5, 2012, who ordered an MRI of Plaintiff's left knee; the MRI taken July 3, 2012 "showed an incomplete transverse fracture through the medial tibial metaphysis with diffuse bone marrow edema; there was no meniscal tear."  *Id.* (emphasis in original).  Hood noted that Plaintiff saw an orthopedic surgeon on November 15, 2012, who wrote that Plaintiff's "x-rays showed a **healed** medial proximal tibial fracture with some slight callus formation."  *Id.* at 70-71 (emphasis in original).  Because of that and a follow-up x-ray taken December 26 showing "mild osteoarthritis of the left knee," Hood wrote that a referral to an orthopedic surgeon was not necessary.  *Id.* at 71 (emphasis in original).

1            **2.      Plaintiff's Pain Medications.**

2            On June 3, 2013 Plaintiff filed an Inmate Letter, stating that Nurse Practitioner

3    Lawrence Ende refused to renew the medications for his chronic conditions that were due

4    to expire on June 18, 2013.  Docs. 120 at 11, ¶ 46; 120-4 at 73.  Plaintiff wrote that it has

5    been a continual problem with his medications "stopping cold turkey."  Doc. 120-4 at 73.

6    Correctional Officer III Lindsey responded and told Plaintiff that his Informal Complaint

7    was being forwarded to Medical for further review.  Doc. 120-4 at 75.  Plaintiff did not

8    receive a response to his Inmate Letter, and subsequently filed a Grievance and a

9    Grievance Appeal.  Doc. 120-4 at 77-78, 80-82.

10           On September 6, 2013, Hood, on behalf of Ryan, responded by denying the

11   appeal.   Doc. 120 at 13-15, ¶ 51.   Hood wrote that Plaintiff has "been provided

12   appropriate management for [his] condition."  Doc. 120-4 at 86.  Regarding Plaintiff's

13   medications, Hood wrote that on May 24, 2013, Plaintiff was seen on the provider line

14   for his complaints of pain behind the knee and left heel.  *Id.*  The nurse noted no

15   deformity of the left knee or foot and Plaintiff's vital signs were within normal limits;

16   therefore, the nurse ordered that Plaintiff's Gabapentin be discontinued when it expired

17   on June 19, 2013 "as it was deemed to be no longer medically necessary."  *Id.*  Hood said

18   that Plaintiff's June 27, 2013 x-ray of his left leg "showed mild to moderate degenerative

19   disease of the medial femoro-tibial compartment; no evidence of fracture or dislocation

20   was noted."  *Id.* (emphasis in original).  Hood wrote that the orthopedic surgeon who saw

21   Plaintiff that same day noted that Plaintiff was "'treated properly since the beginning and

22   [his] bone is completely healed' from an old tibial metaphyseal fracture back in July [sic]

23   2012" and that the "end result is 'excellent.'"  *Id.* (emphasis in original).  Hood stated

24   that an onsite physician reviewed the orthopedic surgeon's consultation notes on July 3

25   [sic], 2013 and "ordered appropriate medications for pain management."  *Id.*  Hood

26   concluded that "the decision to start or discontinue a medication or adjust its dosage is a

27   medical decision based on the prescribing provider's findings and medical judgment; it is

28   not an administrative decision or based on the dictates of the patient."  *Id.* at 87.

Plaintiff filed a new Inmate Letter on September 19, 2013, complaining that nothing was done after he broke his tibia in May 2012 or even after the July 2012 MRI "showed such."   Docs. 120 at 15, ¶ 52; 120-4 at 89.   Plaintiff wrote that he saw physician's assistant Tucker on September 18, 2013, and Tucker told him that he was going to discontinue Plaintiff's Baclofen, which was prescribed for muscle spasms "as the tibia bone ends were disturbed during regeneration, as [he] was forced to walk on this fracture for 16 months now.   Proper healing didn't take place."   Doc. 120-4 at 89. Plaintiff asserted that his Gabapentin had already been "stopped cold turkey" on June 18, 2013 and that to abruptly discontinue Plaintiff's Baclofen "was medically reckless and represents flagrantly inadequate medical care."   *Id.*   Correctional Officer III Taylor responded to Plaintiff's Inmate Letter on October 17, 2013, stating that Plaintiff's non-formulary drug request is "pending approval" and that Plaintiff is to follow-up with the yard nurse. Docs. 120 at 15, ¶ 53; 120-4 at 91.  Taylor also wrote that Plaintiff refused an "alternate treatment plan" for his pain. Doc. 120-4 at 91.

Plaintiff submitted an Inmate Grievance on October 8, 2013, complaining that Tucker "drastically altered [his] medication regimen with the abrupt discontinuation of the Baclofen" and by decreasing his Gabapentin from 3,200 mg daily to 600 mg daily. Docs. 120 at 15, ¶ 54; 120-4 at 93.   Plaintiff wrote that because his fractured tibia was never immobilized or casted, he was at "substantial risk for neurovascular compromise" and that he has daily muscle spasms in his leg due to the discontinuation of the Baclofen and "excruciating pain due to the reduced Gabapentin."  Doc. 120-4 at 93.

On November 5, 2013, "Consultant/RVP" Linda Hammer responded to Plaintiff's Grievance, stating that Plaintiff was seen by a healthcare provider on September 18, 2013, and at that time his Gabapentin was ordered, his Baclofen was discontinued, a physical therapy request was made, and Plaintiff was scheduled for a three-month follow-up.  Docs. 120 at 15-16, ¶ 55; 120-4 at 95.  Hammer told Plaintiff "[p]er DOC policy, clinical decisions and actions regarding health care services provided to you are the sole responsibility of qualified health care professionals.  You do not have the right to dictate

1    treatment or who provides treatment."  Doc. 120-4 at 95.

2         Plaintiff filed a Grievance Appeal on November 27, 2013, asserting that Hammer

3    did not answer "the context" of his grievance.  Docs. 120 at 16, ¶ 56; 120-4 at 97.  Hood

4    responded to Plaintiff's appeal on behalf of Ryan on February 4, 2014, denying the

5    appeal.  Doc. 120 at 16-17, ¶ 57.  Hood noted that Plaintiff was currently on Naproxen

6    and Pamelor for pain control and that his Baclofen, Gabapentin, and Tramadol had been

7    allowed to expire.  Doc. 120-4 at 100.  Hood wrote that "a medical provider may start or

8    discontinue a medication or adjust its dosage based on his/her medical judgment; this is

9    not an administrative decision or based on a patient's preference(s).  Our review showed

10   that you are receiving appropriate medical care and you are continuing to be medically

11   monitored."  *Id.*

12        **B.    Analysis.**

13             **1.    Serious Medical Need.**

14        The parties do not dispute that Plaintiff had a serious medical need.  Nor is there

15   any dispute that Plaintiff's leg injury, eye condition, and pain were worthy of both

16   comment and treatment.  On this record, a jury could find that Plaintiff's conditions

17   constituted a serious medical need.  *See McGuckin*, 974 F.2d at 1059.  The Court

18   therefore turns to the subjective prong of the deliberate indifference analysis.

19             **2.    Deliberate Indifference.**

20        Plaintiff argues that each of the ADC Defendants was deliberately indifferent to

21   his serious medical need.  Under this inquiry, a court must determine whether each

22   defendant had the requisite knowledge of a substantial risk of harm; that is, did each

23   defendant know of and disregard a substantial risk to the plaintiff's health.  *Farmer*, 511

24   U.S. at 837.  "If a person should have been aware of the risk, but was not, then the person

25   has not violated the Eighth Amendment, no matter how severe the risk."  *Gibson v. Cnty.*

26   *of Washoe, Nev*., 290 F.3d 1175, 1188 (9th Cir. 2002) (citation omitted).  When a

27   plaintiff seeks to hold an individual defendant personally liable for damages, the

28   causation inquiry between the deliberate indifference and the Eighth Amendment

deprivation requires a very individualized approach that accounts for the duties, discretion, and means of each defendant.  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).  The Court must examine whether "the specific prison official, in acting or failing to act, was deliberately indifferent to the mandates of the eighth amendment."  *Id*. at 834.

### a.   Ryan and Pratt.

With respect to count one, Plaintiff argues that Ryan and Pratt are responsible for the failure to treat his tibia fracture because it resulted from "systemic deficiencies" in the delivery of healthcare to inmates.  Doc. 126 at 8.  As to count two, Plaintiff argues that Ryan and Pratt implemented a policy requiring providers to "abruptly discontinue" his and other prisoners' medications.  *Id.* at 19-20.

A supervisor may be found liable "for a subordinate's constitutional violations if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."  *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) (quotation marks and citation omitted).  Supervisory liability can also exist when there is "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation," such as when "supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation."  *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (quotation marks and citations omitted).  To establish liability based on a policy, a plaintiff must identify a specific policy and establish a "direct causal link" between that policy and the alleged constitutional deprivation.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

As support for his claims against Ryan and Pratt under count one, Plaintiff cites to an open letter Ryan wrote to healthcare staff in November 2009 addressing an anonymous letter Ryan had received "expressing concerns with the medical staff's ability to provide ADC inmates with constitutionally mandated health care."  Docs. 126 at 10; 127-2 at 40-42.  Plaintiff contends that this letter is "'significant proof' that Director Ryan[] and Mr. Pratt had knowledge of the deficient health care being provided to

inmates as far back as November 2009." Doc. 126 at 10. Plaintiff further asserts that "[u]pon information and belief, Defendant(s) Ryan and Pratt, and the previous Division Director of Health, ('Dr. Michael Adu-Tutu')" exchanged emails "with regards to how dire the situation was with practices related to the provision of health care." *Id.* at 10-11 (citing Ex. 3). Plaintiff's Exhibit 3 is the Third Amended Class Action Complaint in a different case, *Gamez v. Ryan*, No. 10-cv-02070-PHX-JWS (MEA) (D. Ariz. Mar. 6, 2012). *See* Docs. 127-4 at 24-50; 127-5 at 1-47. Plaintiff also refers to what he says is an October 12, 2011 demand letter from attorney Donald Specter regarding "the profound shortcoming in ADC's delivery of medical, dental, and mental health care." Doc. 126 at 11. The Court has reviewed Plaintiff's exhibits and did not locate this letter, although Plaintiff did file a Declaration by Donald Specter dated December 16, 2014 in support of a motion for attorneys' fees and costs in *Parsons v. Ryan*, No. 12-cv-00601-PHX-DKD (D. Ariz. Dec. 16, 2014). Docs. 127-5 at 49-50; 127-6 at 1-11. Finally, Plaintiff relies on a September 21, 2012 "Written Cure Notification" letter to Wexford from ADC as "more probative evidence that tips the balance in favor of concluding that Ryan and Pratt both had knowledge of the systemic deficiencies that expose all inmates to a substantial risk of serious harm." Docs. 126 at 12; 127-2 at 44-50.

Plaintiff's evidence fails to create a genuine issue of material fact regarding Ryan or Pratt. Ryan's 2009 letter to healthcare staff says nothing about ASPC-Lewis, where Plaintiff was housed, and it was issued three years before the alleged violations of Plaintiff's constitutional rights stemming from his leg injury. Although the 2012 Written Cure Notification letter to Wexford does discuss ASPC-Lewis, that discussion relates to a contaminated needle being used to deliver insulin injections to patients in the Morey Unit and ADC having to deploy additional compliance monitoring staff. *See* Doc. 127-2 at 46-47. This letter reflects that ADC was aware of certain problems with Wexford's delivery of healthcare and responded to a problem at ASPC-Lewis, but does not support that Ryan or Pratt had a policy or custom that violated Plaintiff's constitutional rights. The Third Amended Complaint in *Gamez v. Ryan*, which Plaintiff submitted as evidence

in this case, does not appear to encompass Plaintiff's claims and is insufficient to create an issue of fact.  Nor is the attorney declaration in support of the motion for attorneys' fees and costs in *Parsons v. Ryan* probative of the issues in Plaintiff's case.

Finally, with respect to count two, although Plaintiff asserts that he will establish at trial that there was a policy to stop certain of his medications "cold turkey" (Doc. 126 at 20), he provides no evidence of such a policy.  Nor does he provide any evidence to link the alleged policy to Ryan or Pratt.

Therefore, Plaintiff has not presented sufficient evidence that his constitutional rights were violated pursuant to a policy or custom established by Ryan or Pratt, or that a policy or custom was the moving force behind the alleged violation of his rights.  *See City of Canton*, 489 U.S. at 385.  Accordingly, the Court will grant summary judgment to Defendants Ryan and Pratt.  *Celotex*, 477 U.S. at 322 (Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

### b.    Santo.

Under count one, Plaintiff argues that Santo was deliberately indifferent to Plaintiff's serious medical needs.  Doc. 126 at 8.  Plaintiff does not allege that Santo is implicated in count two.  The ADC Defendants argue that while Plaintiff believes Santo should have prescribed crutches, medication, and an immediate provider appointment, Santo treated Plaintiff "according to his observations and assessments made during the two visits he had with him."  Doc. 141 at 12.  They contend that Plaintiff's disagreement with the care Santo provided does not amount to deliberate indifference.  *Id.* at 12-13.  The Court does find a question of material fact regarding Santo that must be resolved at trial.

Plaintiff saw Santo two times after he injured his leg on May 3, 2012.  Plaintiff first saw Santo on May 14, 2012, the day after he submitted an HNR complaining that he could hardly walk on his leg and that his leg was getting worse with pressure and

swelling.  Doc. 120-3 at 8.  Plaintiff wrote that his pain was a 7-8 on a scale of 1-10 and that he may need x-rays.  *Id.*  Plaintiff testified at his deposition that Santo "noticed I couldn't bear weight that much."  Doc. 127-2 at 10 (Pl. Dep. at 34:17-18).  Plaintiff testified that his ADA porter helped him to this appointment, and that he had his left arm around the porter's shoulder because he "could barely put pressure on [his] tiptoes."  *Id.* at 11 (Pl. Dep. at 41:1-8).  Plaintiff testified that his left leg "was swollen and discolored pretty severely" and that "the pain was pretty severe."  *Id.* at 10 (Pl. Dep. at 34:20-21, 35:9).  Santo, however, asserts that Plaintiff's leg showed no evidence of trauma, swelling or bruising, and Plaintiff was able to bear weight on his left leg.  Docs. 120 at 5, ¶ 20; 120-3 at 39-40, ¶ 10.  Nevertheless, Santo prescribed medical ice to Plaintiff and told Plaintiff to submit an HNR if the pain did not subside in a few days.  *Id.*

As Santo instructed, Plaintiff submitted an HNR a week later, on May 22, 2012, stating that he was "in excruciating pain still" and asking to see the provider as soon as possible.  Docs. 120 at 6, ¶ 22; 120-3 at 15.  Plaintiff did not see Santo until May 31, 2012.  Santo "did not observe any swelling or signs of trauma," but again gave Plaintiff medical ice and scheduled Plaintiff to see the healthcare provider.  Doc. 120 at 6, ¶ 23.

Plaintiff did not see a doctor until June 5, 2012, nearly a month after he injured his leg or three weeks after the ADC Defendants say Plaintiff submitted his first HNR about his leg.  Dr. Merchant noted in Plaintiff's medical chart left "knee pain" and "tender tibial plateau, unable to one leg stand, flex/ext."  Doc. 120-3 at 11.  Merchant ordered an MRI and a consultation with an orthopedic specialist.  Doc. 120 at 6, ¶ 25.  The MRI was not taken for another month, and it showed an "incomplete transverse fracture through the medial tibial metaphysis with diffuse bone marrow edema."  *Id.*, ¶ 26.

The Court finds there is a genuine issue of material fact sufficient to defeat summary judgment.  Defendants do not dispute that Plaintiff broke his leg, and a reasonable jury could conclude that the fact that Santo provided Plaintiff with ice after both visits and indicates that there was some evidence of swelling or trauma.  In making its determination the jury must weigh Plaintiff's and Santo's credibility.  It is not the

1   Court's function to weigh evidence or make credibility findings at the summary judgment

2   stage. *Anderson*, 477 U.S. at 249.  Accordingly, the Court will deny summary judgment

3   for Defendant Santo as to count one.

4   **V.     Merchant's Motion for Summary Judgment.**

5         **A.     Relevant Facts.**

6         Dr. Merchant asserts that June 5, 2012 was the first time he examined or treated

7   Plaintiff for his complaints of left knee pain.  Doc. 97 at 2, ¶ 6.  Merchant saw Plaintiff

8   that day both for "complaints of continued pain in his left knee and issues related to his

9   eye condition."  *Id.*  Merchant wrote in Plaintiff's medical chart that Plaintiff noted a

10  "popping sound then had pain/swelling of the knee."  Doc. 97-1 at 2.  Merchant wrote

11  that Plaintiff had a "tender tibial plateau, unable to one leg stand, flex/ext."  *Id.* at 8.

12  Merchant also noted that Plaintiff "has keratoconus and need[s] every 3 month [follow-

13  up] appt [with] ophth."[12]  *Id.* at 2.  He ordered an MRI of the left knee and what appears

14  to be a referral for an ophthalmological consultation.  *Id.* at 8.  The MRI performed on

15  July 3, 2012 showed, in part, an "[i]ncomplete transverse fracture through the medial

16  tibial metaphysis with diffuse bone marrow edema."  *Id.* at 12.  On July 13, 2012,

17  Merchant noted the MRI results in Plaintiff's chart and ordered an "ortho surg consult."

18  *Id.* at 8.

19        According to Merchant, he next saw Plaintiff on August 7, 2012 for complaints

20  related to his eye condition.  Doc. 97 at 2, ¶ 9.  Merchant claims that Plaintiff asked him

21  to discuss the results of his July 3, 2012 MRI, but that "ASPC policy" limited him to only

22  addressing one medical issue with a patient per visit.  *Id.*, ¶¶ 9-10.  Merchant told

23  Plaintiff that he would have to discuss his MRI test results at another appointment.  *Id.*,

24  ¶ 10.  Merchant asserts that "ASPC policy was the only reason that [he] did not discuss

25  [Plaintiff's] MRI test results with him on August 7, 2012."  *Id.*

26  

27        [12] Defendants provided this page from Plaintiff's medical chart but do not say if

28  Merchant wrote these June 5, 2012 notes.  However, it appears that Doc. 97-1 at 2 is the
    beginning of Merchant's notes, which continue on Doc. 97-1 at 8.

Merchant asserts that over the next eight weeks, until the end of September 2012, he "instructed his nurses to page [Plaintiff] to return to the medical unit to discuss the results of the July 3, 2012 MRI test." *Id.* at 2-3, ¶ 11.  Merchant states in a declaration that he "personally heard nurses order that [Plaintiff] be paged to the medical unit."  Doc. 97-1 at 5, ¶ 8.  He says that to the best of his knowledge, Plaintiff "did not respond to the pages requesting him to visit the medical unit despite his obvious opportunity to do so." *Id.*, ¶ 9.  Merchant asserts that if Plaintiff "had visited the medical unit after August 7, 2012 regarding his MRI test results, I would have advised him of the MRI results and provided appropriate treatment." *Id.*, ¶ 10.  He says pain medication was available during this time if Plaintiff "suffered any pain while the incomplete left tibial fracture was healing," and that he had previously provided Plaintiff with a six-month prescription for 800 mg of Ibuprofen, which would have lasted Plaintiff through the recovery period. *Id.* ¶ 11.  In his opinion, Plaintiff's leg injury would have healed by the end of September 2012. *Id.* at 5-6, ¶ 12.

Plaintiff disputes each of Merchant's claims.  Plaintiff disputes that he complained of eye problems on August 7, 2012, and he asserts that Nurse Reece told him that the appointment was to discuss the MRI results.  Doc. 112 at 3, ¶ 9.  Plaintiff disputes that ASPC policy limited Merchant to only addressing one issue during his August 7, 2012 visit.  *Id.*, ¶ 10.  In support, Plaintiff points to his June 5, 2012 appointment with Merchant when Merchant addressed both his knee and leg pain and his eye problems.  *Id.* Plaintiff disputes that Merchant had him paged for eight weeks, asserting that his unit has no public address system.  *Id.*, ¶ 11.  Plaintiff further contends that he was never told to return to medical for "treatment of his fracture[d] tibia" and that if he did refuse medical treatment, he would have to sign a refusal form.  *Id.* at 4, ¶ 12.  Plaintiff disputes that 800 mg of Ibuprofen, prescribed for headaches, would have helped his leg pain, which, he contends, continues to this day.  *Id.*, ¶ 14; Doc. 111 at 11.  He also disputes that his leg has healed, asserting that he received no treatment "until it was too late therefore affecting the long-term results."  Doc. 112 at 4, ¶ 15.

**B.  Analysis.**

**1.  Serious Medical Need.**

Again, Merchant does not appear to dispute that Plaintiff's leg injury constituted a serious medical need.  On this record, a jury could find that Plaintiff's conditions constituted a serious medical need.  *See McGuckin*, 974 F.2d at 1059.  Therefore, the Court's inquiry focuses on whether there is a genuine issue of material fact regarding whether Merchant was deliberately indifferent to that serious medical need.

**2.  Deliberate Indifference.**

Merchant argues that Plaintiff's deliberate indifference claim against him fails because Plaintiff provides no evidence "that he suffered a permanent injury," that he "suffered unnecessary and wanton infliction of pain," or that Merchant did not have him repeatedly paged to review the results of the MRI exam and to prescribe appropriate treatment.  Doc. 122 at 2-4.  To establish deliberate indifference, a court must determine whether each defendant had the requisite knowledge of a substantial risk of harm; that is, did each defendant know of and disregard a substantial risk to the plaintiff's health. *Farmer*, 511 U.S. at 837.  "If a person should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188.

Merchant contends that "[t]he record contains overwhelming evidence that Plaintiff suffered no significant injury as a result of going untreated."  Doc. 122 at 2.  As evidence, Merchant points to his own opinion that "Plaintiff's condition would have healed naturally by September 2012."[13]  *Id.*; Doc. 97-1 at 5-6, ¶ 12.  Merchant also relies on Dr. Vanderhoof's review of Plaintiff's x-rays in November 2012 showing "a healed medial and proximal tibial fracture," and Vanderhoof's June 2013 report that Plaintiff's tibia was completely healed, that Plaintiff was "treated properly since the beginning," and

---

[13]  Merchant provides no information regarding the type of fracture Plaintiff suffered, how such a fracture is typically treated, or if such fractures are typically allowed to heal on their own with no treatment.

1    the "end result is excellent." Doc. 122 at 2-3 (citing Doc. 97-1 at 28). Merchant asserts

2    in his declaration that he agrees with Dr. Vanderhoof's June 2013 conclusion that

3    Plaintiff's ongoing knee pain "was due to pes bursitis, a condition unrelated to his

4    incomplete tibial fracture." Docs. 97-1 at 6, ¶ 15; 122 at 3.

5          Merchant did not provide a declaration or affidavit from Dr. Vanderhoof to

6    support that Vanderhoof concluded that Plaintiff's ongoing knee pain was unrelated to

7    Plaintiff's tibial fracture. The Court notes that Vanderhoof's earlier November 15, 2012

8    report states, in part, "Impression: Left pes bursitis, status post proximal medial tibial

9    fracture." Doc. 97-1 at 23. While this report indicates a healed tibial fracture, it does not

10   say unequivocally that the pes bursitis is unrelated to the prior fracture, and, indeed,

11   appears to indicate some relationship between the pes bursitis and the fracture.[14] *Id.*

12         Vanderhoof saw Plaintiff a year after his injury, in June 2013, and wrote in his

13   report that Plaintiff was "complaining of medial and proximal tibial pain consistent with

14   pes bursitis," and that he believes the pes bursitis "is likely not related to his fracture or

15   any treatment thereof," but is likely related to "hamstring tightness." *Id.* at 28.

16   Vanderhoof wrote, "I think _____ treated properly since the beginning _____ quite

17   normally and his bone is completely healed. He did not know all the details, but certainly

18   the end result is excellent." *Id.* It is not clear that Vanderhoof was writing that Plaintiff's

19   tibia was treated properly since the day he fractured his leg, or at some later point, such

20   as when Plaintiff first saw Vanderhoof six months later, or whether "completely healed"

21   means the bone healed properly. Vanderhoof did not say who he believed treated

22   Plaintiff properly. Nor does he say anything about the cause or severity of the pain

23   Plaintiff suffered between May 3, 2012 when Plaintiff injured his leg and his first visit

24   with Vanderhoof in November 2012. Vanderhoof's notes are simply too ambiguous to

25   conclude that Vanderhoof is of the opinion that Merchant properly treated Plaintiff's leg

26   _____

27         [14] Merchant provides no information explaining whether pes bursitis can or cannot

28   be related to the type of fracture Plaintiff suffered in the early months after he fractured
     his tibia.

fracture or associated pain.

The evidence reflects that Merchant saw Plaintiff on June 5, 2012, noting in Plaintiff's medical chart left "knee pain" and "tender tibial plateau, unable to one leg stand, flex/ext." *Id.* at 8. Merchant ordered an MRI of Plaintiff's left knee, and the "Outside Consultation Request" he wrote states that Plaintiff presented with an "acute [left] knee injury and hearing popping sound. [Patient] notes pain and swelling to [left] knee and instability to [left] knee on exam." Doc. 112 at 26. Based on Merchant's examination of Plaintiff and his request for an outside orthopedic consultation and MRI, the Court finds that Merchant was aware of Plaintiff's pain and serious medical need. The issue, then, is whether Merchant disregarded that serious medical need.

The MRI was performed on July 3, 2012. Doc. 120-3 at 20. Plaintiff submitted an HNR on July 9, 2012, asking for an appointment with the provider to discuss the results of his MRI. *Id.* On July 13, 2012, Merchant noted the MRI results in Plaintiff's medical chart and he ordered "ortho surg consult." Doc. 97-1 at 8. Plaintiff contends – and Merchant does not dispute – that Merchant has never discussed the results of the MRI with him. Doc. 111 at 5.

Plaintiff next saw Merchant on August 7, 2012, but Merchant claims the appointment was to address Plaintiff's eye problem, and, because "ASPC policy" prevented him from discussing more than one issue per patient visit, he did not discuss Plaintiff's MRI results at that time. Doc. 97 at 2, ¶¶ 9-10. Merchant does not provide a copy of any "ASPC policy" that says he is limited to addressing only one issue during a patient visit, and his own notes reflect that he addressed at least two issues during Plaintiff's June 5, 2012 visit relating to Plaintiff's eye problems and his leg pain. Therefore, there is no competent evidence supporting Merchant's assertion that he could not discuss Plaintiff's MRI results during the August 7, 2012 visit. Moreover, Merchant provides no explanation for why he did not try to see Plaintiff immediately upon receipt of the MRI results, which Merchant noted in Plaintiff's chart on July 13, 2012.

Plaintiff disputes that he was ever paged to return to the medical unit, asserting

that his unit does not have a paging system, and he says he would have to sign a form had he refused medical services.  Doc. 111 at 14-15.  The Court observes that Merchant's claim that he instructed nurses to page Plaintiff is not corroborated by any of the nurses who allegedly paged Plaintiff, and Merchant presents no notes from Plaintiff's medical chart or elsewhere indicating that he was attempting to contact Plaintiff to have him return to the medical unit or that Plaintiff was refusing to return to the medical unit.  Nor does Merchant say that paging an inmate is how such contact is normally made.  Moreover, in addition to the July 9, 2012 HNR asking to discuss the MRI results, Plaintiff submitted another HNR dated August 8, 2012, again asking for an appointment to discuss the results of the MRI.  Doc. 120-3 at 27.  Under "Plan of Action" on the HNR, RN Reese wrote on August 14, 2012, "I will schedule you."  *Id.*  Merchant does not say that an appointment was ever made for Plaintiff to discuss the results of the MRI.  Nor is it clear why Plaintiff would submit HNRs asking for appointments to discuss his MRI results and then ignore pages to go to the medical unit.

The Court finds a genuine issue of material fact regarding whether Merchant was deliberately indifferent to Plaintiff's serious medical needs once he received the results of Plaintiff's MRI.  Because credibility is at issue in this claim, there remain material factual disputes precluding summary judgment in Merchant's favor.  *Anderson*, 477 U.S. at 249.  Merchant's motion for summary judgment is therefore denied.

**VI.    Wexford's Motion for Summary Judgment.**

**A.    Relevant Facts.**

Plaintiff alleged in his Complaint that after he fractured his tibia, Wexford "took months getting [him] to an outside specialist," proving that Wexford was "operating under a policy of providing deficient health care."  Doc. 1 at 16.  Because Plaintiff's claim against Wexford relates to a policy or practice, the Court will not repeat the facts related to Plaintiff's leg injury in May 2012, when he was seen, or the evidence in Plaintiff's medical records.

Wexford provided medical services to inmates under a contract with ADC from

July 1, 2012 through March 3, 2013.  Doc. 89 at 2, ¶ 1.  At his deposition, Plaintiff was asked if there were policies in place that were supposed to be followed, and he answered, "Yes, sir."  Docs. 89 at 6, ¶ 42; 89-1 at 55-56 (Pl. Dep. at 87:25-88:2).  Plaintiff was then asked, "If those policies that were in place were followed, do you think you would have received adequate health care?," to which Plaintiff answered, "Absolutely."  Docs. 89 at 6, ¶ 42; 89-1 at 56 (Pl. Dep. at 88:3-6).

### B.    Analysis.

Wexford argues that Plaintiff failed to state a claim against it in his Complaint and asks that Plaintiff's claim against it be dismissed under Federal Rule of Civil Procedure 12(b)(6).  Doc. 88 at 7-8.  Alternatively, Wexford argues that it is entitled to summary judgment because Plaintiff cannot show that a Wexford policy caused the alleged violation of his constitutional rights, and that Plaintiff admitted at his deposition that if Wexford's policies were followed by medical staff, "he would have received proper care and treatment."  *Id.* at 8.

### 1.    Dismissal Under Rule 12(b)(6).

A Rule 12(b)(6) motion to dismiss is almost never an appropriate response when the Court has already screened a prisoner complaint pursuant to 28 U.S.C. § 1915A(b) and directed the defendants to respond.  The standard for dismissal under Rule 12(b)(6) ("failure to state a claim upon which relief can be granted") is virtually identical to the standard under 28 U.S.C. § 1915A(b) ("fails to state a claim upon which relief may be granted").  After the Court has screened a prisoner complaint pursuant to § 1915A(b), a Rule 12(b)(6) motion to dismiss should be granted only if the defendants can convince the Court that reconsideration is appropriate.  Reconsideration is appropriate only "if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law."  *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (citation omitted).

The Court screened Plaintiff's complaint and determined that his allegations

sufficiently stated a plausible claim for relief against Wexford.  Doc. 6 at 6.  To the extent Defendants seek reconsideration of the screening order, their motion is untimely.  *See* LRCiv 7.2(g)(2) (motion for reconsideration must be filed no later than 14 days from date of the order that is subject of the motion).  Moreover, Defendants do not address any of the factors that would warrant reconsideration of the screening order.  *See Sch. Dist. No. 1J*, 5 F.3d at 1263.  For these reasons, the Court will deny Wexford's request for dismissal under Rule 12(b)(6).

### 2.     Motion for Summary Judgment.

A private entity is liable under § 1983 if a plaintiff's constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012); *Buckner v. Toro*, 116 F.3d 450, 452-53 (11th Cir. 1997).  A private entity is not liable simply because it employed individuals who allegedly violated a plaintiff's constitutional rights.  *See Tsao*, 698 F.3d at 1139.  Therefore, Wexford can only be held liable under § 1983 for its employees' civil rights deprivations if Plaintiff can show that an official policy or custom caused the constitutional violation.  *Id.*; *George v. Sonoma Cnty. Sheriff's Dep't*, 732 F. Supp. 2d 922, 940 (N.D. Cal. 2010).

To maintain a claim against Wexford as an entity, Plaintiff must meet the test articulated in *Monell v. Department of Social Services*, 436 U.S. 658, 690-94 (1978).  *See Tsao*, 698 F.3d at 1139 (applying *Monell* to private entities).  The requisite elements of a § 1983 claim against a private entity performing a state function are: (1) the plaintiff was deprived of a constitutional right; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation.  *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001) (quotation marks and citation omitted).

To support an Eighth Amendment medical care claim, a prisoner must show a "serious medical need" and that the defendant's response to that need was deliberately

1   indifferent.  *Jett*, 439 F.3d at 1096.  As noted above, the Court has determined that there
2   is a triable issue of fact regarding whether Defendants Santo and Merchant were
3   deliberately indifferent to Plaintiff's serious medical needs.  The Court therefore proceeds
4   to the other elements of the *Monell* test.

5       An entity may be held liable if injury results from execution of an expressly
6   adopted official policy or as a result of a longstanding practice or custom that constitutes
7   "standard operating procedure" of the entity.  *Price v. Sery*, 513 F.3d 962, 966 (9th Cir.
8   2008).  Liability for an improper policy or custom "may not be predicated on isolated or
9   sporadic incidents; it must be founded upon practices of sufficient duration, frequency
10  and consistency that the conduct has become a traditional method of carrying out policy."
11  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citations omitted).  Whether an entity
12  has a policy of deliberate indifference is generally a jury question.  *Gibson*, 290 F.3d at
13  1194-95.

14      Plaintiff argues that Merchant did not review the results of his MRI for ten days
15  "due to Wexford's policies of not having enough health care workers to treat the large
16  number of inmates."  Doc. 113 at 10.  Plaintiff also contends that Merchant did not
17  discuss his MRI results or treat his leg on August 7, 2012 "due to Wexford's policy or
18  protocol precluding him from discussing such.  Dr. Merchant was limited to addressing
19  only one medical issue with a patient per visit."  *Id.* at 11.

20      While Plaintiff argues generally that his rights were violated pursuant to a policy
21  or practice, he fails to present evidence of a specific Wexford policy that led to a
22  violation of his constitutional rights.  In fact, Plaintiff testified that if Wexford's policies
23  had been followed, he would have received adequate health care.  Therefore, Plaintiff's
24  claim appears to rely more on a practice or custom than a policy of deficient healthcare.

25      Plaintiff argues that ADC's September 2012 Written Cure Notification letter to
26  Wexford shows "systemic deficiencies that expose all inmates to a substantial risk of
27  serious harm."  *Id.* at 13.  While Plaintiff argues that it shows "systemic deficiencies," he
28  does not say which portion of the seven-page letter specifically applies to his situation.

As the Court previously noted, the 2012 Written Cure Notification letter to Wexford does discuss ASPC-Lewis, where Plaintiff was housed, but that particular discussion related to a contaminated needle being used to deliver insulin injections to patients in the Morey Unit.  *See* Doc. 127-2 at 46-47.  Thus, the letter does not support that Wexford had a policy, practice, or custom that violated Plaintiff's constitutional rights.

Plaintiff also argues that the alleged lack of treatment for his leg was due to Wexford's "policy or custom they endorsed in order to save money."  Doc. 113 at 15.  As support for this argument, Plaintiff points to a sentence in a Wexford "Provider Handbook" that states "The mere existence of a condition DOES NOT CONSTITUTE A RESPONSIBILITY for repair!"  *Id.*; Doc. 114-5 at 8 (emphasis in original).  This sentence is in a section titled "Cost Considerations" and is followed by:

> When considering alternative treatment approaches, cost becomes a consideration.  Even then, it is not THE determinant, but only ONE of several possible variables considered.  Cost, per se, usually becomes the last variable considered, belying its importance.

> Meanwhile, the role of the medical staff is to: 1) provide medical care to individual patients, and 2) seek the best quality we can afford and spread our health care budget to effectively cover as many services as possible.  Cost has been and must continue to be a consideration.  The 'cost of service' remains an important factor to be shouldered by each health care professional.  Being fiscally responsible builds a broader range of treatment alternatives.

Doc. 114-5 at 8 (emphasis in original).  While Plaintiff apparently assumes that cost was the determinative factor in his alleged lack of treatment, these general statements about cost considerations in a Provider Handbook do not support that conclusion.

Even assuming he has established the existence of a Wexford policy, custom, or practice, Plaintiff has not presented sufficient evidence that his constitutional rights were violated pursuant to it or that it was the moving force behind the alleged violation of his rights.  The Court will therefore grant summary judgment to Wexford.

/ / /

/ / /

- 30 -

VII.   **The Corizon Defendants' Motion for Summary Judgment.**

    A.   **Defendant Mahler.**

        1.   **Relevant Facts.**

Plaintiff alleged in his Complaint that Mahler, a Registered Nurse, failed to appropriately treat his injured leg on May 3 and 14, 2012.  Doc. 1 at 5-8.  He further alleged that Mahler "actively thwarted" his attempt to see a medical doctor for his leg. *Id.* at 9.  Mahler asserts that she did not begin working at ASPC-Lewis until November 2012, and she was not involved at all in Plaintiff's medical care in May 2012.  Doc. 65-11 at 2-3, ¶¶ 2, 4.  Mahler states that she was working for BBVA Compass Insurance in Phoenix, Arizona in May 2012, she did not see or treat Plaintiff on May 3rd or 14th, and his medical records do not reflect that she was involved in his care on those dates.  *Id.* at 3, ¶ 4.  Plaintiff disputes that Mahler was not involved in his care in May 2012 (Doc. 93-1 at 3), but he cites no evidence in support other than his statement that "he remembers being seen by a nurse who looks a lot like Defendant Mahl[e]r" (Doc. 93 at 4).

        2.   **Analysis.**

In addition to Mahler's sworn declaration that she did not work at ASPC-Lewis in May 2012 and that she had no role in treating Plaintiff's injured leg in May 2012, the Corizon Defendants argue that Plaintiff's medical records do not show that Mahler was present or treated Plaintiff on those dates.  Doc. 64 at 12 (citing Doc. 65-2 at 67).  The medical records provided by the Corizon Defendants show entries for May 14, May 31, and June 5, 2012.[15]  Doc. 65-2 at 67.  Mahler's name does not appear in those entries.

Plaintiff has not presented any documentary evidence showing that Mahler treated him in May 2012.  Plaintiff states that he disputes Defendants' assertion that Mahler did not treat him, but Defendants have presented unrefuted evidence that she was not at ASPC-Lewis during the relevant time period.  Therefore, it is Plaintiff's burden to come forward with specific evidence demonstrating the existence of a factual dispute.  Plaintiff

---

[15] As previously noted, there is no medical documentation in the record of Plaintiff being treated on May 3, 2012.

1    has not done so.  Accordingly, the Court will grant summary judgment to Mahler.

2          **B.    Defendant Tucker.**

3                **1.      Relevant Facts.**

4          On August 7, 2012, Dr. Merchant prescribed Baclofen 20 mg three times daily for

5    180 days for Plaintiff's eyelid spasms.[16]  Docs. 65 at 2, ¶ 6; 65-5 at 41.  Merchant also

6    prescribed Gabapentin 1,600 mg twice daily for 180 days for herpes simplex virus

7    ("HSV") type 1, which Plaintiff contracted following a corneal transplant in 2009.  *Id.*

8          On November 15, 2012, Plaintiff saw Dr. Vanderhoof for his medial knee pain and

9    medial tibial pain; Vanderhoof noted that Plaintiff's prior tibia fracture was healed and

10   that he believed Plaintiff had left pes bursitis.  Docs. 65 at 3, ¶ 7; 65-3 at 28-29.  Tucker,

11   a physician's assistant, asserts that tight hamstring muscles "are known to cause pes

12   bursitis."  Docs. 65 at 3, ¶ 7; 65-1 at 6, ¶ 14.

13         In June 2013, Plaintiff was taking Baclofen 60 mg daily, Tegretol 800 mg daily,

14   Tramadol 100 mg daily,[17] and Gabapentin 3,200 mg daily; the Gabapentin prescription

15   expired June 18, 2013.  Docs. 65-1 at 7, ¶ 19; 65-5 at 13-14.

16         Plaintiff saw Dr. Vanderhoof again on June 27, 2013, and noted that Plaintiff was

17   "complaining of medial and proximal tibial pain consistent with pes bursitis" due to

18   hamstring tightness; Vanderhoof did not believe Plaintiff's pes bursitis was related to the

19   fracture or its treatment, and noted that Plaintiff's bone was "completely healed."  Docs.

20   65 at 3, ¶ 8; 65-3 at 8.  Plaintiff also complained of left plantar fasciitis, which

21   Vanderhoof wrote was treatable with gentle stretching exercises.  *Id.*  Vanderhoof gave

22

23   ────────────────

24         [16] The Corizon Defendants inexplicably assert in their statement of facts that
     Plaintiff's medical records indicate he last received Baclofen in October 2012, (Doc. 65

25   at 2, ¶ 6), but Tucker, in his declaration, reports that Plaintiff was taking Baclofen
     between April and September 2013, which is when Tucker discontinued Plaintiff's

26   Baclofen.  Doc. 65-1 at 6-8, ¶¶ 16, 18-19, 21, 23-24.

27         [17] Tucker states that "Tramadol is used to treat moderate to moderately severe

28   pain," and Tegretol "is an anticonvulsant and mood stabilizer that may also be used to
     treat complex regional pain syndrome."  Doc. 65-1 at 6, ¶ 17.

Plaintiff an injection of Lidocaine in his left pes bursa.  *Id.*

On July 11, 2013, x-rays were taken of Plaintiff's tibia-fibula and heel.  Doc. 65-4 at 23.  The x-ray report found the left heel to be normal and the left tibia and fibula "show[ed] no evidence of fracture dislocation or lytic or blastic lesions.  The soft tissues are intact as are the bones of the knee and ankle visualized." *Id.*

In July 2013, Plaintiff was taking the following medications for pain: Baclofen 60 mg daily, Tegretol 800 mg daily, and Tramadol 100 mg daily.  Docs. 65-1 at 7, ¶ 21; 65-4 at 63-65.   In August and through most of September 2013, Plaintiff was taking the following medications for pain: Baclofen 60 mg daily, Tegretol 800 mg daily, Tramadol 100 mg daily, Pamelor 75 mg daily, and Ibuprofen 2,400 mg daily.  Docs. 65-1 at 8, ¶¶ 23-24; 65-4 at 61; 65-5 at 3-4.

On September 11, 2013, Plaintiff submitted an HNR regarding his fractured tibia, which he says did not heal correctly and left him with a "permanent disability," pain, and tenderness.  Doc. 25-9 at 21.  Plaintiff asked to see the healthcare provider for pain management issues, writing "Gabapentin [was] stopped, Tramadol [is] not working!" *Id.*

On September 18, 2013, Tucker saw Plaintiff for the first time "for his complaint of chronic pain from his previous tibia fracture."  Doc. 65 at 4, ¶ 10.  Tucker discussed Plaintiff's MRI and x-ray reports from Dr. Vanderhoof.  *Id.*  Tucker asserts that Plaintiff's tibia fracture had healed by then, "but he had continued symptoms of suspected bursitis," and so Tucker submitted a Consultation Request for physical therapy.[18]  *Id.*; Doc. 65-3 at 19.   According to Tucker, Plaintiff told him that the Tramadol gave no relief for his pain, but Gabapentin did provide some relief, so Tucker ordered that Plaintiff's Gabapentin be renewed at 600 mg for Plaintiff's "persistent pain complaints with his leg."  Doc. 65 at 4, ¶ 11.  Plaintiff disputes that he told Tucker

_____

[18] Plaintiff disputes that Tucker submitted a consultation request for physical therapy in September 2013 because he did not have his first physical therapy appointment until July 29, 2014.  Doc. 93-1 at 4, ¶ 10.  Plaintiff does not cite any evidence in support of his contention, and the Court notes that the record contains a physical therapy consultation request by Tucker dated September 18, 2013.  Doc. 25-3 at 50.

1    Tramadol gave no relief but Gabapentin gave some relief.  Doc. 93-1 at 5, ¶ 11.

2    Plaintiff's dispute seems contrary to the statement in his September 11 HNR that the

3    Tramadol was "not working!" (Doc. 25-9 at 21), although Plaintiff may have meant, for

4    example, the dosage was not correct.  But Plaintiff does not explain the apparent

5    inconsistency in his statements.

6          Plaintiff apparently stopped taking Gabapentin on June 18, 2013 when his

7    prescription expired, and he was not on Gabapentin when he saw Tucker on September

8    18.  Docs. 65-5 at 13; 65 at 4, ¶ 11.  Tucker asserts that 600 mg is the standard starting

9    dose "with titration to max dose 1800 mg/day."  Doc. 65 at 4, ¶ 11.  Plaintiff disputes that

10   600 mg daily is the "standard of care with titration to max dose 1800 mg/day."  Doc. 93-1

11   at 5, ¶ 11.  Plaintiff asserts that Dr. Merchant wrote him a prescription for Gabapentin at

12   3,200 mg daily, and that "[u]pon information and belief, Corizon, LLC ha[s] a policy of

13   1800 mg/daily is the max dose of Gabapentin in order to save money."  *Id.*  Plaintiff,

14   though, cites no evidence to support that 600 mg is not the standard starting dose or that

15   Corizon had a policy of limiting Gabapentin prescriptions to 1,800 mg daily.

16         In addition to prescribing Gabapentin on September 18th, Tucker also planned to

17   have Plaintiff continue non-steroidal anti-inflammatory drugs ("NSAIDs"), although he

18   does not say which NSAID he planned to have Plaintiff take.  Doc. 65 at 4, ¶ 11.  Tucker

19   discontinued the Baclofen because it was not approved "for Plaintiff's type of chronic

20   pain."  Doc. 65-1 at 9, ¶ 26.  Tucker explained that Baclofen "is primarily used to treat

21   muscle spasms as they relate to spinal cord injuries or multiple sclerosis," which Plaintiff

22   did not have, and muscle relaxants are not commonly used to treat long-term chronic pain

23   "as they are highly addictive, lose their effectiveness over time, and create security issues

24   in a prison setting."  *Id.*  Tucker states that muscle relaxants are for patients "who suffer

25   from an acute injury" and should only be prescribed for no more than five-to-ten days.

26   *Id.*  Plaintiff asserts that he was taking Baclofen for his eyelid spasms and pain and that

27   Tucker discontinued his Baclofen that day "cold turkey."  Doc. 93-1 at 4-5, ¶¶ 10, 12.

28   Plaintiff states that Tucker told him "the Baclofen was written for the wrong reasons."

1    *Id.* at 5, ¶ 12.

2         The Corizon Defendants assert that Plaintiff never complained of any medication

3    withdrawal symptoms between September 2013 and January 2014.  Doc. 65 at 5, ¶ 13.

4    Plaintiff disputes that he never complained of withdrawal symptoms, asserting that he

5    "complained on a daily basis for almost 2 weeks to Nurse Mahler."  Doc. 93-1 at 5-6,

6    ¶ 13.   Plaintiff cites no evidence, such as an affidavit or HNRs, to support that he

7    complained to Mahler of withdrawal symptoms or that Tucker was aware of these

8    complaints.  The Court notes that Plaintiff did submit an Inmate Grievance on October 8,

9    2013, complaining that Tucker "drastically altered [his] medication regimen with the

10   abrupt discontinuation of the Baclofen" and decreased his Gabapentin from 3,200 mg

11   daily to 600 mg daily.  Doc. 120-4 at 93.  And he filed an Inmate Grievance Appeal on

12   November 27, 2013, asserting that Tucker "is guilty for failing to use appropriate caution

13   in not tapering [him] off of a serious medication such as Baclofen" and that Tucker

14   stopped his pain medication Tramadol "cold turkey" on November 5, 2013.  *Id.* at 97-98.

15   Plaintiff, though, does not cite to these documents, and there is no evidence that Tucker

16   was aware of Plaintiff's Inmate Grievance and Grievance Appeal, which were responded

17   to by Linda Hammer and ADC Deputy Director Hood, respectively.  *Id.* at 95, 100.

18        Between October and December 2013, Plaintiff was taking the following for pain:

19   Tegretol 800 mg daily (reduced to 600 mg daily on October 23rd), Gabapentin 600 mg

20   daily, Pamelor 75 mg daily, and Tramadol 100 mg daily (expired November 6, 2013).

21   Docs. 65-1 at 9, ¶ 27; 65-4 at 66-71; 65-5 at 1-2.

22        Plaintiff wrote numerous HNRs regarding his medical, dental, and mental health

23   care both before and after he saw Tucker on September 18, 2012.  *See, e.g.*, Docs. 25-8 at

24   30-50; 25-9 at 1-2.   With respect to the medications at issue in this case, Plaintiff

25   submitted the following HNRs:

26        • On October 16, 2013, Plaintiff wrote that his Tramadol was set to expire
27          on November 5, 2013, and he asked that it be renewed so it "isn't
            stopped cold turkey as countless times with my other meds before."
28          Doc. 25-9 at 8.  Plaintiff also asked that his prescription be increased to

100 mg twice daily for "pain, nerve [and] blood vessel compromise, fracture[d] tibia." *Id.* The response says "PL scheduled." *Id.*

- On November 3, 2013, Plaintiff asked for refills of three prescriptions, which he only identified by prescription number, and he wrote "(Baclofen?)." *Id.* at 2. The response says "Processed to Pharmacy" and "your Baclofen has expired – see your provider." *Id.*

- On November 7, 2013, Plaintiff asked to see Tucker about pain in his left leg and heel. Doc. 25-8 at 48. Plaintiff requested an x-ray of his tibia that he said he fractured in May 2012 and "was mishandled early in care. X-ray the tibia, not the knee! The Tramadol exp 11/5/13 cold turkey!" *Id.* The response says "scheduled." *Id.*

- On November 11, 2013, Plaintiff wrote that his Tramadol prescription expired on November 5, 2013, his Baclofen was discontinued, and his Gabapentin was decreased from 3,200 mg daily to 600 mg daily. *Id.* at 47. Plaintiff said his pain has intensified and his leg hurts "really bad" when he walks and he needs a cane or wheelchair. *Id.* The response on says "scheduled." *Id.*

- On November 20, 2013, Plaintiff wrote an HNR asking to see Tucker "to renew prescriptions, console's [sic] written, [etc.]." *Id.* at 46. The response says "f/u scheduled." *Id.*

Tucker saw Plaintiff for the second time on January 7, 2014; Plaintiff was complaining of continued pain in his lower left leg. Doc. 65 at 5-6, ¶ 18. Tucker questioned the cause of Plaintiff's pain since his tibia was healed, and he noted Dr. Vanderhoof's working diagnosis of pes bursitis due to hamstring tightness. *Id.* Because Plaintiff reported that Gabapentin no longer provided relief, Tucker discontinued the Gabapentin by decreasing the dosage over four days and then stopping the Gabapentin altogether; he planned to start Plaintiff on Naprosyn for pain relief. *Id.* Tucker says Plaintiff "was amenable to this plan of therapy." *Id.* Tucker asserts that Plaintiff had taken Gabapentin in the past for "herpetic neuralgia" related to his corneal transplants in 2009, but that the condition "is usually short lived, lasting weeks or months," and Plaintiff's recent ophthalmology notes did not indicate Plaintiff still had herpetic infection. *Id.* at 6, ¶ 19. Tucker says Plaintiff requested Gabapentin for his leg pain, not

his eyes.  *Id.*  Plaintiff disputes that he told Tucker that Gabapentin no longer gave him relief and he insists that "[a]t no time was [he] amenable to this plan of therapy."  Doc. 93-1 at 6, ¶ 18.

Plaintiff's medical record for January 2014 shows Plaintiff taking Tegretol, Pamelor, Naprosyn, and Gabapentin for pain, which was decreased to 300 mg four times a day for three days, and then discontinued.  Docs. 65 at 7, ¶ 22; 65-4 at 57-60.

Plaintiff saw an outside ophthalmologist, Dr. Warren Heller, on January 14, 2014 for a contact lens fitting related to his keratoconus condition.  Doc. 65 at 6, ¶ 20.  In his report, Heller wrote they were able to fit Plaintiff's right eye with a keratoconus lens and recommended Visine Allergy drops for dry eyes.  Doc. 25-3 at 34.  Heller recommended that Plaintiff get "these contact lenses" and be fitted with "puntal plugs" for dryness in his eyes.  *Id.*  Heller also recommended that Plaintiff be prescribed Tramadol for pain for six months.  *Id.* at 34, 36.

Plaintiff was again seen by Dr. Heller in February and April 2014, but the Corizon Defendants assert that Plaintiff did not complain of pain during those visits, and Heller did not repeat his recommendation for Tramadol at either of those visits.  Docs. 65 at 6, ¶ 20; 65-2 at 81; 65-3 at 2.  The Corizon Defendants do not say how they know Plaintiff did not complain of pain during his visits with Dr. Heller in February and April.  There is no affidavit from Heller stating such.  Heller's report from the February 4, 2014 visit states only that Plaintiff came to pick up his keratoconus contact lenses and they seem to fit well, that Plaintiff should be seen on a yearly basis, and they gave him a free pair of safety glasses to protect his eyes.  Doc. 65-3 at 2.  Heller's report from the April 14, 2014 visit states that Plaintiff has dry eye syndrome, he was fitted with "four different plugs," and he should be seen again in six months.  Doc. 65-2 at 81.  There are no notes from Plaintiff's visit with Dr. Heller indicating whether he reported pain.

Plaintiff disputes that he "did not discuss any symptoms associated with eye pain on Jan 14, 2014 with" Tucker and that he told "Tucker that his eyes hurt on most days with pressure, headaches.  This is why Dr. Heller wrote Rx for Tramadol 300 mg daily."

Doc. 93-1 at 6, ¶ 20.  It is not clear if Plaintiff saw both Tucker and Heller on January 14, 2014, or if Plaintiff meant to say that he complained to Heller on January 14th about his eyes hurting or that he complained to Tucker about eye pain during his January 7th visit.

Tucker states that he did not follow Heller's recommendation to prescribe Tramadol for Plaintiff for several reasons, including the fact that Plaintiff was already taking Gabapentin, Tegretol, and Pamelor for pain.  Doc. 65-1 at 10-11, ¶ 31.  Tucker asserts that keratoconus normally presents "little to no sensation of pain" and treatment usually involves eye drops and/or contact lenses.  *Id.*  Tucker says it was "very unusual" for Dr. Heller to prescribe Tramadol, which is classified by the U.S. Drug Enforcement Administration as a Schedule IV drug and "acts like a narcotic in that it is addictive."  *Id.*  Plaintiff disputes that his keratoconus is not painful or that it would be unusual for Dr. Heller to prescribe Tramadol.  Doc. 93-1 at 3, 7.  Tucker further asserts that "drugs such as Tramadol create security concerns in a prison setting in that they are abused and diverted in the prison system."  Doc. 65-1 at 10-11, ¶ 31.  Tucker, though, does not say Plaintiff was abusing or diverting Tramadol.

On January 29, 2014, Plaintiff submitted an HNR asking to see Tucker to discuss "pain issues" and stating that he has pain in both eyes and his left leg "from untreated fracture[d] tibia."  Doc. 25-8 at 29.  Plaintiff said Dr. Heller wrote a prescription for Tramadol 300 mg daily, "but Tucker refuse[d] to follow such orders."  *Id.*  The response says "scheduled."  *Id.*

On February 12, 2014, Plaintiff submitted an HNR asking for a consultation with Dr. Vanderhoof for a cortisone injection for his pain.  Doc. 25-8 at 27.  Plaintiff wrote that his last injection was in June 2013 and "DOC/Corizon has denied [him] physical therapy? [sic]  They both as well as Wexford Health breached the duty of care owed to [him] by negligently causing [him] pain."  *Id.*  Plaintiff stated that he fractured his left tibia and that evidence at trial will prove that his pain could have been prevented and that his pain medications "were stopped cold turkey."  *Id.*  The response says "pending approval," but it does not say what is pending approval.  *Id.*

Plaintiff filed another HNR on February 26, 2014 about his fractured left tibia, for which "casting was never done, no treatment!  I am constantly experiencing pain."  *Id.* at 26.  Plaintiff requested "a CT scan and MRI to know if the 'trauma' fracture has also damaged some tissues, ligaments, or tendons or if any nerve has been severed or compressed."  *Id.*  The response says "scheduled."  *Id.*

Plaintiff filed his Complaint in this case on February 28, 2014.  *See* Doc. 1.

Plaintiff's medical record indicates that in February and March 2014 Plaintiff was taking Tegretol and Pamelor.  Docs. 65 at 7, ¶ 23; 65-4 at 54-56.  On March 9, 2014, Plaintiff submitted an HNR asking to see the provider about a cane and physical therapy; he wrote that he has "continuous pain, weakness, tenderness, weight bearing issues of left lower extremity."  Doc. 25-8 at 25.  The response says "your PT consult was resubmitted and is pending approval or denial."  *Id.*  Plaintiff submitted a second HNR on March 9th stating that he is experiencing "decreased mobility and tenderness to light touch," pain that "is a continuous ache that increases with weight bearing on the left lower extremity to 8/10 severity," and left knee pain "with palpation, tender to range of motion."  *Id.* at 13.  He also expressed concerns of "abnormal soft tissue calcifications."  *Id.*  Plaintiff asked to see the nurse and said he thinks an ace bandage may help.  *Id.*  The response says "scheduled, nurses are unable to give without orders."  *Id.*

In April 2014, the records indicate Plaintiff was taking Tegretol, Naprosyn, and Pamelor.  Docs. 65 at 7, ¶ 24; 65-4 at 51-52.  On April 10, 2014, Plaintiff submitted an HNR stating that his pain is "8/10 severity!"  Doc. 25-8 at 10.  Plaintiff wrote that if he is not seen by April 20, 2014, he intends to file a complaint with the Arizona Medical Board, and if Tucker denies receiving some of his HNRs, he will testify that Tucker "was told of their contents by nursing staff."  *Id.*  The response says "[y]ou are scheduled for an appointment."  *Id.*

Tucker saw Plaintiff for the third time on April 18, 2014, "primarily for Plaintiff's

/ / /

/ / /

recent suicid[e] attempt."[19]   Doc. 65 at 7, ¶ 25.   Tucker ordered that all of Plaintiff's medications be "direct observed therapy" in accordance with policy for patients with suicidal ideation.  *Id.*

On May 8, 2014, Plaintiff submitted an HNR to see the provider to discuss supportive walking shoes and custom arch supports and orthotics to "resolve a true case of 'plantar fasciitis.'"   Doc. 25-8 at 11.   Plaintiff also asked to see a neurosurgeon, a podiatrist, and a neurologist "due to the untreated fracture[d] tibia."  *Id.*

On May 13, 2014, Tucker saw Plaintiff for the fourth time, primarily for his chronic care of hypertension, leg pain, and keratoconus.  Docs. 65 at 8, ¶ 26; 65-1 at 11-12, ¶ 34.  Plaintiff reported that Naprosyn gave him no relief and requested Gabapentin and Tramadol.  *Id.*  Tucker states "it was difficult to assess Plaintiff's leg pain because he had subjective complaints but his gait and range of motion were normal."  *Id.*  He noted that Plaintiff's symptoms "suggested plantar fasciitis/bursitis" and he submitted a consult for supportive walking shoes for the plantar fasciitis.[20]   *Id.*   Tucker discontinued Plaintiff's Naprosyn and Pamelor and submitted a non-formulary drug request for Gabapentin and Tramadol for pain.[21]   *Id.*   Tucker says Plaintiff requested a consultation with a neurosurgeon, but "his exam did not warrant a consult to see a neurosurgeon because he has not had motor or sensation defects on examination."  Doc. 65-1 at 12, ¶ 35.

_____

[19] Tucker asserts that Plaintiff was put on suicide watch on April 17, 2014, "after falsely reporting to medical that he had overdosed on his blood pressure medication."  Doc. 65-1 at 11, ¶ 33.

[20] Plaintiff disputes that his gait and range of motion were normal and says he "was still requesting a cane."  Doc. 93-1 at 7, ¶ 26.  Tucker states that Plaintiff did submit an HNR for a cane on March 9, 2014, but based on his observation that Plaintiff had a "normal gait and no distress with ambulation," a cane was "not necessary for his current health status."  Doc. 65-1 at 11, ¶ 32.

[21] Tucker does not say what happened to this non-formulary drug request for Gabapentin and Tramadol, but Plaintiff asserts that Corizon denied the requests for Gabapentin, Tramadol, and supportive walking shoes.  Doc. 93-1 at 7, ¶ 26.

Plaintiff's medical records indicate that in May, June, and July 2014, he was taking Tegretol and Pamelor.  Doc. 65 at 8, ¶ 27.

On July 24, 2014, Plaintiff saw Dr. Vanderhoof again.  *Id.*, ¶ 28.   In his consultation report, Vanderhoof wrote that Plaintiff "has a medial tibial plateau fracture he seems quite fixated on.  It is well healed and documented it has been well healed.  He is here just to complain about the fracture and why it was not treated immediately with immobilization."  *Id.*; Doc. 65-2 at 76.  Vanderhoof noted that Plaintiff has "medial proximal tibial pain" that "is most consistent with pes bursitis," that he has some mild foot pain, but denies any numbness or tingling, and that he has "decent range of motion of his left knee as well."  *Id.*  Vanderhoof remarked that Plaintiff's fracture "is now completely healed.  He is deconditioned however.  He needs aggressive physical therapy and some anti-inflammatories.  I think by undergoing physical therapy, we may get rid of most of his aches and pains."  *Id.*  Vanderhoof recommended physical therapy, a cane, and Tramadol.  *Id.* at 79.

Plaintiff had an appointment at USA Sports Therapy on July 29, 2014, and the physical therapist recommend six-to-eight follow-up visits.  Doc. 65 at 8-9, ¶ 29.  On July 31st, Tucker made a consultation request for an additional six-to-eight visits of physical therapy.  *Id.*; Doc. 65-1 at 13, ¶ 37.

On August 5, 2014, Tucker saw Plaintiff for a fifth time and prescribed a trial of the NSAID Indocin for Plaintiff's chronic pain.  Doc. 65 at 9, ¶ 30.

Tucker asserts that Plaintiff's tibia fracture was healed by November 2012, and he defers to the diagnosis of the specialist, Dr. Vanderhoof, of pes bursitis as the source of Plaintiff's leg pain and plantar fasciitis for his foot pain.  *Id.*, ¶ 31; 65-1 at 13, ¶ 39.  Tucker states that pes bursitis "is a reasonable differential diagnosis for [Plaintiff's] leg pain, and NSAIDs and physical therapy are proper, conservative measures of management."  Doc. 65-1 at 13, ¶ 39.  Tucker asserts that Plaintiff "has no medical need for Baclofen 60 mg daily, Tramadol 300 mg daily, or Gabapentin 3200 mg daily."  *Id.* at 4, ¶ 5.  Tucker has "prescribed several different medication combinations to treat

Plaintiff's pain" and asserts that "Plaintiff is currently taking NSAIDs for pain."  Doc. 65 at 9, ¶ 32.

In addition to prescribing various medications for pain, Tucker referred Plaintiff for physical therapy, submitted a consult for supportive walking shoes, and instructed Plaintiff on exercises for plantar fasciitis, all in accordance with Dr. Vanderhoof's recommendations.  *Id.*, ¶ 33.  Tucker asserts that at all times, he relied solely on his medical judgment to determine appropriate medical care for Plaintiff and "never knowingly disregarded [Plaintiff's] medical needs or health."  Doc. 65-1 at 13, ¶ 40.

Plaintiff says it took 16 months before he received his first physical therapy appointment and argues that Tucker never followed up to see if the non-formulary drug requests were approved or denied.  Doc. 93-1 at 8, ¶ 33.  Plaintiff also disputes that Tucker treated him in accordance with Vanderhoof's recommendations because Vanderhoof prescribed Tramadol for Plaintiff on July 24, 2014, and Tucker "refused such orders."  *Id.*  Plaintiff does not submit any evidence showing that Tucker "refused" Vanderhoof's recommendation for Tramadol.  However, the Corizon Defendants assert that Plaintiff "is currently taking NSAIDs for pain," which presumably does not include Tramadol, and they state Plaintiff has no medical need for Tramadol 300 mg daily.  *See* Doc. 65 at 9, ¶ 32.

### 2. Analysis.

Plaintiff cites to the July 24, 2014 "ADOC Summary" indicating Plaintiff was seen by Dr. Vanderhoof for left knee pain and that Vanderhoof recommended physical therapy, a cane, and Tramadol.  Doc. 93-1 at 23.  The Corizon Defendants asserts that, under Rule 401 of the Federal Rules of Evidence, this medical record is irrelevant because it is dated months after Plaintiff filed his Complaint on February 28, 2014.  Doc. 99 at 3.  They argue that "[t]he fact that a doctor may have ordered Tramadol in July 2014 has absolutely nothing to do with whether Corizon Defendants were deliberately indifferent during the time period in Plaintiff's Complaint."  *Id.*  It is not clear why the Corizon Defendants say that Plaintiff's exhibit from July 2014 is irrelevant when the

Corizon Defendants themselves presented Dr. Vanderhoof's report from that very same visit, which includes the Tramadol recommendation.  *See* Docs. 65 at 8, ¶ 28; 65-2 at 77-79.  Moreover, the Corizon Defendants argue that Vanderhoof concluded at that July 24, 2014 visit that Plaintiff "should be treated with aggressive physical therapy and NSAIDs" (Doc. 64 at 15), while omitting that Vanderhoof also recommended Tramadol and a cane (Doc. 65-2 at 79).  Finally, to establish deliberate indifference, Plaintiff must show harm caused by the indifference, and the Court may consider Vanderhoof's July 24, 2014 recommendations to the extent they support that Plaintiff was harmed as a result of the denial or delay in care for his fractured tibia.

The Corizon Defendants do not dispute that Plaintiff had a serious medical need. Therefore, the Court's analysis focuses on whether there is a question of fact regarding Tucker's alleged deliberate indifference to that need.

The Corizon Defendants argue that Plaintiff's claim against Tucker presents "nothing more than a disagreement with his course of treatment, which is not actionable under § 1983."  Doc. 64 at 13 (citing *Jackson*, 90 F.3d at 332).  They contend that while Tucker did not prescribe Baclofen, "he did prescribe, or Plaintiff was otherwise taking, Tegretol, Pamelor, Tramadol, and Gabapentin for pain between September 2013 and January 2014."  *Id.*  They further argue that "[b]ecause Plaintiff was already receiving several pain medications, he cannot show that the deprivation of Tramadol objectively deprived him of the 'minimal civilized measure of life's necessities.'"  *Id.* at 15 (citing *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004)).  They also argue that Plaintiff presents no evidence that the pain medications Tucker selected were "medically unacceptable under the circumstances," and Plaintiff did not provide evidence from an expert to show that Tucker's decisions were unacceptable or in conscious disregard of an excessive risk to Plaintiff's health.  *Id.* (citing *Ploof v. Ryan*, No. 13-cv-00946-PHX-DGC (MHB), 2014 WL 3720542, *6 (D. Ariz. July 28, 2014)).  They conclude that Tucker "has constantly prescribed pain medications to Plaintiff from September 2013 to present, and Plaintiff merely disagrees with the types of pain medications he received,"

and that the outside specialist, Dr. Vanderhoof, "concluded that Plaintiff should be treated with aggressive physical therapy and NSAIDs," which "negates any inference of deliberate indifference." *Id.*

Based on the record evidence, the Court finds a genuine issue of material fact regarding whether Tucker was deliberately indifferent to Plaintiff's serious medical needs, particularly the management of his pain issues.  When Plaintiff saw Tucker on September 18, 2013, Plaintiff was taking the following medications for pain: Tegretol 800 mg daily, Pamelor 75 mg daily, Tramadol 100 mg daily, Baclofen 60 mg daily, and Ibuprofen 2,400 mg daily.  Docs. 65-1 at 8, ¶ 24; 65-4 at 61.  Plaintiff's Baclofen prescription had an expiration of July 3, 2014.  Doc. 120-4 at 84.  Nevertheless, Tucker asserts that he discontinued the Baclofen in September 2013 because it was not approved for Plaintiff's type of chronic pain and should not be prescribed for longer than five-to-ten days.  Doc. 65-1 at 9, ¶ 26.  Tucker does not say for which chronic pain condition the Baclofen was prescribed, and the record is not entirely clear on this point.

On August 7, 2012, Dr. Merchant prescribed a 180-day supply of Baclofen for "lid spasms" and a 180-day supply of Gabapentin 1,600 mg for "HSV type 1 bilat eye infections (S/P corneal transplant)."  Doc. 25-7 at 21.  However, in Plaintiff's September 19, 2013 HNR complaining about Tucker discontinuing his Baclofen, Plaintiff wrote that "Central Office has stated that the Baclofen is appropriate for the pain, muscle spasms from my fracture[d] tibia [for which] nothing was done."  Doc. 93-1 at 27.  Plaintiff also wrote in a September 19, 2013 Inmate Letter that Baclofen "was prescribed for muscle spasms as the tibia bone ends were disturbed during regeneration, as [he] was forced to walk on this fracture for 16 months now.  Proper healing didn't take place."  Doc. 120-4 at 89.  In addition to the confusion about who prescribed the Baclofen and for what purpose, Tucker's assertions about the length of time a patient should take Baclofen appears to contradict Dr. Merchant's actions in prescribing a 180-day supply of Baclofen.  The only evidence that Baclofen should not be taken for longer than five-to-ten days is Tucker's statement in his declaration, which is not supported by any other authority.

Moreover, a reasonable jury could conclude that a physician's assistant decision not to follow the recommendations of a doctor was medically unacceptable under all of the circumstances.  *See Snow v. McDaniel*, 681 F.3d 978, 988-89 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

Next, there is a question of fact regarding Plaintiff's Gabapentin prescription. Plaintiff was not on Gabapentin when he saw Tucker on September 18, 2013, and Tucker asserts that 600 mg is the standard starting dose "with titration to max dose 1800 mg/day," which Plaintiff disputes.  Docs. 65 at 4, ¶¶ 10-11; 93-1 at 5, ¶ 11.  Tucker's assertions in his declaration are the only evidence submitted as to the maximum dose of Gabapentin, and the Corizon Defendants do not explain why Dr. Merchant prescribed Gabapentin at 3,200 mg daily back on August 7, 2012.  Nor do they explain why Plaintiff was apparently taking Gabapentin 3,200 mg daily through June 18, 2013.  Also, it does not appear that Tucker ever increased Plaintiff's dosage of Gabapentin beyond 600 mg daily and he does not explain why the dosage was not increased.

As to Tucker's claim that Plaintiff did not complain about medication withdrawal symptoms between September 2013 and January 2014, the evidence in the record reflects otherwise.  Although not specifically using the word "withdrawal, Plaintiff asked in an October 16, 2013 HNR that his Tramadol, which was set to expire on November 5, 2013, not be "stopped cold turkey as countless times with my other meds before" and that the dosage be increased.  Doc. 25-9 at 8.  In a November 7, 2013 HNR, Plaintiff asked to see Tucker, and noted that his Tramadol had expired on November 5, 2013 "cold turkey!" Doc. 25-8 at 48.  In a November 11, 2013 HNR, Plaintiff wrote that his Tramadol prescription had expired on November 5, 2013, his Baclofen was discontinued, and his Gabapentin was decreased from 3,200 mg daily to 600 mg daily.  *Id.* at 47.  Plaintiff said his pain has intensified, his leg hurts "really bad" when he walks, and he needs a cane or wheelchair.  *Id.*  Tucker does not deny receiving these HNRs.  Thus, there is a question of fact whether Tucker was aware of and disregarded Plaintiff's complaints of pain, including withdrawal.

1       Plaintiff's Tramadol prescription also presents a genuine dispute of material fact.

2  Against the recommendations of both Dr. Heller and Dr. Vanderhoof, Tucker declined to

3  prescribe Tramadol to Plaintiff.   Docs. 65-1 at 10-11, ¶ 31; 93-1 at 8, ¶ 33.   Again, a

4  reasonable jury could conclude that a physician's assistant's decision not to follow the

5  recommendation of a specialist was medically unacceptable under all of the

6  circumstances.  *See Snow*, 681 F.3d at 988-89.

7       On this record, the Court finds there is a genuine issue of material fact regarding

8  whether Tucker was deliberately indifferent to Plaintiff's serious medical needs, and the

9  Court will deny summary judgment to Tucker.

10       **C.**    **Corizon.**

11       Corizon replaced Wexford as the ADC health care provider beginning March 4,

12  2013.  Doc. 64 at 3 n.4.  As noted, a private entity is liable under § 1983 if a plaintiff's

13  constitutional rights were violated as a result of a policy, decision, or custom

14  promulgated or endorsed by the private entity, and not simply because it employed

15  individuals who allegedly violated a plaintiff's constitutional rights.  *Tsao*, 698 F.3d at

16  1138-39; *Buckner*, 116 F.3d at 452.  Also, as noted, Plaintiff must meet the four-part test

17  articulated in *Monell* showing that: (1) he was deprived of a constitutional right;

18  (2) Corizon had a policy or custom; (3) that amounted to deliberate indifference to

19  Plaintiff's constitutional right; and (4) Corizon's policy or custom was the moving force

20  behind the constitutional violation.  *Mabe*, 237 F.3d at 1110-11.

21       The Court has determined that there is a triable issue of fact regarding whether

22  Santo, Merchant, and Tucker were deliberately indifferent to Plaintiff's serious medical

23  needs.  The Court therefore proceeds to the other elements of the *Monell* test.  Although

24  the Court has determined that whether Plaintiff was deprived a constitutional right is a

25  question of fact, Plaintiff fails to satisfy the other three *Monell* factors.  Plaintiff argues

26  that there is a question of fact as to whether Tucker's alleged deliberate indifference "was

27  a product of policy or custom for which Corizon, LLC can be held liable."  Doc. 93 at 13.

28  Plaintiff asserts that although Corizon's contract with ADC "initially contemplated that

all physician's assistant[s] would be supervised by a medical doctor, the evidence will reveal at trial that a custom and practice developed so that the policy was that P.A. Tucker was authorized to function without any supervision or review at all." *Id.* at 14. Plaintiff further contends that, on information and belief, Corizon had no medical director at ASPC-Lewis during the relevant time, and that Corizon, ADC, and the Arizona Department of Health Services had entered into a memorandum of understanding, "and had established a policy that medical care for inmates at the Bachman Unit would be provided by a physician's assistant.  Tucker was that physician's assistant." *Id.* at 15.

While Plaintiff argues generally that his rights were violated pursuant to a policy or practice, he fails to present any evidence, other than his own speculation, of a specific, policy, custom, or practice of Corizon that led to a violation of his constitutional rights. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation omitted); *see Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.").

Because Plaintiff has not presented any evidence that his constitutional rights were violated pursuant to a policy, custom, or practice established by Corizon, or that a policy, custom, or practice was the moving force behind the alleged violation of his rights, the Court will grant summary judgment to Corizon.

**IT IS ORDERED:**

1.      The reference to the Magistrate Judge is withdrawn as to Defendants Tucker, Mahler and Corizon's motion for summary judgment (Doc. 64); Defendant Wexford's motion for summary judgment (Doc. 88); Defendant Merchant's motion for summary judgment (Doc. 96); Defendants Ryan, Pratt, and Santo's motion for summary judgment (Doc. 119); and Plaintiff's motion to supplement his response to Defendants Tucker, Mahler, and Corizon's motion for summary judgment (Doc. 124).

2.    Plaintiff's motion to reopen discovery and file an amended complaint (Doc. 146) is **denied**.

3.    Plaintiff's motion to supplement his response to Defendants Tucker, Mahler, and Corizon's motion for summary judgment (Doc. 124) is **denied**.

4.    Defendants Tucker, Mahler, and Corizon's motion for summary judgment (Doc. 64) is **granted in part** and **denied in part**.  The motion is granted as to Defendants Mahler and Corizon and denied as to Defendant Tucker.

5.    Defendant Wexford's motion for summary judgment (Doc. 88) is **granted**.

6.    Defendant Merchant's motion for summary judgment (Doc. 96) is **denied**.

7.    Defendants Ryan, Pratt, and Santo's motion for summary judgment (Doc. 119) is **granted in part** and **denied in part**.  The motion is granted as to Defendants Ryan and Pratt and denied as to Defendant Santo.

8.    Corizon, Wexford, Mahler, Ryan, and Pratt are **dismissed** as Defendants.

9.    The remaining claims are Count I against Defendants Santo and Merchant and Count II against Defendant Tucker.

10.    The Court will set a final pretrial conference by separate order.

Dated this 5th day of January, 2016.

David G. Campbell
United States District Judge